258 F.3d 1136 (9th Cir. 2001)
 DEFENDERS OF WILDLIFE; TUCSON HERPETOLOGICAL SOCIETY; HORNED LIZARD CONSERVATION SOCIETY; SIERRA CLUB; DESERT PROTECTIVE COUNCIL; BIODIVERSITY LEGAL FOUNDATION; DALE TURNER; WENDY HODGES; FRANCIS ALLAN MUTH, PLAINTIFFS-APPELLANTS
v.
GALE NORTON, SECRETARY OF THE DEPARTMENT OF THE INTERIOR,* JAMIE RAPPAPORT CLARK, DIRECTOR, U.S. FISH AND WILDLIFE SERVICE; GAIL KOBETICH, SUPERVISOR, CARLSBAD FIELD OFFICE, DEFENDANTS-APPELLEES.
 No. 99-56362,, 00-55496
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted January 9, 2001--Pasadena, California
Filed July 31, 2001
 
 Counsel Neil Levine, Earthlaw, Denver, Colorado, for the plaintiffs-appellants.
 Robert H. Oakley and Andrew Mergen, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the defendants-appellees.
 D.C. No. CV-97-02330-TJW/LSP Appeal from the United States District Court for the Southern District of California Thomas J. Whelan, District Judge, Presiding
 Before: Stephen S. Trott, Sidney R. Thomas, and Marsha S. Berzon, Circuit Judges.
 
 Berzon, Circuit Judge
 
 1
 The Defenders of Wildlife ("Defenders") appeal from an order of the district court granting summary judgment in favor of the Secretary of the Interior (the "Secretary"). The order upheld a decision by the Secretary not to designate the flat-tailed horned lizard for protection as a threatened species under the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1531 et seq. We find that, in making that decision, the Secretary both relied on an improper standard and failed to consider important factors relevant to the listing process. Accordingly, we find her decision arbitrary and capricious and reverse the district court's order.
 
 I. Background
 
 2
 The Endangered Species Act protects species of fish, wildlife and plants which the Secretary identifies as either "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6). Similarly, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(20).
 
 
 3
 If the Secretary decides that, based on "the best scientific and commercial data available," one or more of five statutorily defined factors demonstrates that a species is endangered or threatened,[1] shemust issue a proposed rule recommending that species for ESA protection. 16 U.S.C. §§ 1533(b)(1)(A). A period of public comment follows. Within one year, the Secretary must either publish a final rule designating the species for protection or, if she finds"that available evidence does not justify the action," withdraw the proposed rule. 50 C.F.R. §§ 424.17(a)(iii); see also 16 U.S.C. §§ 1533(b)(6)(A).[2]
 
 A. The Flat-Tailed Horned Lizard
 
 4
 At issue in this case is the flat-tailed horned lizard (Phrynosoma mcallii) (the "lizard"), "a small, cryptically colored iguanid" that has adapted to the harsh conditions of the western Sonoran desert. 58 Fed. Reg. 62,624, 62,625/1 (Nov. 29, 1993). "It has the typically flattened body shape of horned lizards, a dark mid-vertebral stripe, a somewhat flattened tail, relatively long head spines or horns, and two rows of fringed scales on each side of the body. Dorsally, the flat-tailed horned lizard is pale gray to light rusty brown; the animal's ventral surface is white and unmarked." Id.
 
 
 5
 The lizard's natural habitat stretches across parts of southern California (namely, Imperial and eastern San Diego counties), southwestern Arizona and northwestern Mexico. Id. at 62,626/1. Over the last century, human activity has markedly affected this habitat. The filling of the Salton Sea, the conversion of arid desert into productive agricultural land, and the development of urban areas around Yuma, Arizona and El Centro, California have resulted in the disappearance of approximately 34% of the lizard's historic range. Id. As a result, animal conservation groups, including Defenders, have expressed concerns about the lizard's continued viability, and the United States Fish and Wildlife Service ("FWS") had targeted the lizard for ESA protection for much of the past two decades. 62 Fed. Reg. 37,852, 37,854 (July 15, 1997).
 
 B. The Lizard's Listing History
 
 6
 The Secretary first identified the lizard as a category 2 candidate for listing under the ESA in 1982. Candidates are "any species being considered by the Secretary for listing as an endangered or threatened species, but not yet the subject of a proposed rule." 50 C.F.R. §§ 424.02(b). At that time,[3] FWS regulations defined candidates designated category 2 as "taxa for which information in the possession of the Service indicated that proposing to list as endangered or threatened was possibly appropriate, but for which sufficient data on biological vulnerability and threats were not currently available to support proposed rules." 61 Fed. Reg. 7596, 7597 (Feb. 28, 1996).
 
 
 7
 The lizard remained a category 2 candidate until 1989, when the Secretary elevated it to category 1 status. Category 1 included species "for which the Service has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposed rule." Id. It was not until November 29, 1993, however, that the Secretary finally published a proposed rule listing the lizard as a threatened species. 58 Fed. Reg. at 62,624/3. Pursuant to the statutory requirements, the Secretary should have completed her review of the lizard and issued her final order by November 29, 1994. 16 U.S.C. §§ 1533(b)(6)(A)(i) (requiring action within one year of publication of the proposed rule). That day passed, however, without further action by the Secretary.
 
 
 8
 The passage of Public Law No. 104-6, 109 Stat. 73 (1995), in April 1995 interrupted progress on the lizard and other species awaiting listing decisions. Although the statute's primary purpose was to replenish funds for various overseas military operations, it included a rider that withdrew $1.5 million "from the amounts available [to the FWS] for making determinations about whether a species is a threatened or endangered species and whether habitat is critical habitat under the Endangered Species Act of 1973." Id. Furthermore, the rider provided that:
 
 
 9
 none of the remaining funds appropriated under [the Endangered Species Act] may be made available for making a final determination that a species is threatened or endangered or that habitat constitutes a critical habitat (except a final determination that a species previously determined to be endangered is no longer endangered but continues to be threatened).
 
 
 10
 To the extent that the Endangered Species Act of 1973 has been interpreted or applied in any court order (including an order approving a settlement between the parties to a civil action) to require the making of a determination respecting any number of species or habitats by a date certain, that Act shall not be applied to require that the determination be made by that date if the making of the determination is made impracticable by the recission made by the preceding sentence.
 
 
 11
 Id.; see also Environmental Defense Center v. Babbitt, 73 F.3d 867 (9th Cir. 1995) (discussing the impact of Public Law No. 104-6). Thus, while the 1995 rider did not directly repeal the ESA, it imposed a virtual moratorium on all species listings. Id. at 870-71.
 
 
 12
 The moratorium remained in effect until April 26, 1996, when President Clinton signed an executive waiver allowing the Secretary to once again list species for protection.[4] Another year passed, however, without a final decision on the lizard. Finally, on May 16, 1997, in response to a lawsuit brought by Defenders to compel action on the lizard, the district court in Arizona ordered the Secretary to issue a final decision within 60 days.
 
 
 13
 One month after the court's order, a group of federal and state agencies[5] signed a Conservation Agreement ("CA") implementing a recently completed rangewide management strategy to protect the lizard, developed by representatives of the Federal Bureau of Land Management ("BLM"), the FWS, and state and local agencies. Pursuant to the CA, cooperating parties agreed to take voluntary steps aimed at"reducing threats to the species, stabilizing the species' populations, and maintaining its ecosystem." The underlying management strategy was based on an earlier effort by the BLM and the California Department of Fish and Game to provide protections for the lizard after it had been elevated to category 1 candidate status by the FWS in 1989.
 
 
 14
 Critical to the implementation of the CA was the designation of five "management areas" (MAs) subject to protective measures, including the monitoring of lizard populations, limitation of habitat disturbance including off-highway vehicle use, and acquisition of private inholdings. Some of the measures included in the CA had been in place for years, long before the Secretary published the initial proposed rule recommending the lizard for protection. Many of the actions and the overall scope of the MAs effected by the conservation effort, however, were new.
 
 
 15
 The Secretary issued her final decision on July 15, 1997 (the "Notice") withdrawing the proposed rule that had earlier recommended the lizard for listing as a threatened species. The Notice was premised on three factors: (1) that population trend data did not conclusively demonstrate significant population declines; (2) that some of the threats to the lizard's habitat had grown less serious since the proposed rule was issued; and (3) that the recently devised "conservation agreement w[ould] ensure further reductions in threats. " 62 Fed. Reg. 37852. The Secretary's ultimate conclusion also turned on her determination that, however serious the threats to the lizard on private land, "[l]arge blocks of habitat with few anticipated impacts exist on public lands throughout the range of this species . . . ." 62 Fed. Reg. 37860. The Secretary did not, however, separately consider whether the lizard is or will become extinct in "a significant portion of its range, " as that term is used in the statute.
 
 
 16
 Six months after the Secretary withdrew the proposed rule, Defenders filed the instant suit challenging that decision. The district court granted summary judgment in favor of the Secretary on June 16, 1999, upholding the Secretary's decision not to list the lizard. The court accepted the Secretary's conclusion that none of the five statutory factors were present with respect to the lizard, holding that the Secretary reasonably relied on the Conservation Agreement to support that conclusion. This appeal followed.
 
 II. Analysis
 
 17
 Defenders claims that "the best scientific evidence" available on the lizard and its habitat demonstrates the presence of as many as four of the five statutory factors indicating that a species is either threatened or endangered and thus eligible for ESA protection. The Secretary's answer to this claim is two-fold: First, although the Secretary does not dispute that these factors may evidence threats to the lizard on private land, she contends that adequate habitat exists on public land to ensure the species' viability. Second, the Secretary relies on the newly introduced Conservation Agreement, which she contends will establish added protections for the lizard's public land habitat and thus remove the threat of extinction through-out all or a significant portion of its range in the foreseeable future. Both parts of this analysis, we conclude, are faulty.
 
 
 18
 A. "Extinction throughout . . . a significant portion of its range"
 
 
 19
 The distinction between public and private land explains much of the dispute between the Secretary and Defenders. Defenders' arguments in support of its claim that listing is warranted focus primarily on the loss of lizard habitat on private land. The Secretary, on the other hand, emphasizes the conservation efforts on public land to support her conclusion that the lizard is not threatened with extinction. 62 Fed. Reg. at 37,858 ("Because of the large amount of flat-tailed horned lizard habitat located on public lands within the United States and the reduction of threats on these lands due to changing land-use patterns and conservation efforts of public agencies, threats due to habitat modification and loss do not warrant listing of the species at this time." (Emphasis added)). The distinction also explains, in large part, the shift between the Secretary's initial findings that accompanied the proposed rule, recommending the lizard for protection based on concern about habitat loss on private land, and her findings that accompanied the withdrawal decision, emphasizing that available public lands are sufficient to support the species.
 
 
 20
 Whether the lizard's potential survival in its public land habitat is sufficient to preclude ESA protection depends largely on the meaning of the phrase "in danger of extinction throughout . . . a significant portion of its range." 16 U.S.C. §§ 1532(6) (emphasis added). Assuming the lizard's population remains viable on public land, it is not in danger of extinction throughout all its range. Defenders argue, however, that if the lizard's private land habitat constitutes "a significant portion of its range" and its survival there, as Defenders allege, is in jeopardy, the ESA requires the Secretary to designate the lizard for protection.
 
 
 21
 Standing alone, the phrase "in danger of extinction throughout . . . a significant portion of its range " is puzzling. According to the Oxford English Dictionary, "extinct" means "has died out or come to an end . . . . Of a family, class of persons, a race of species of animals or plants: Having no living representative." Thus, the phrase"extinc[t] throughout . . . a significant portion of its range" is something of an oxymoron. Similarly, to speak of a species that is "in danger of extinction" throughout "a significant portion of its range" may seem internally inconsistent, since "extinction " suggests total rather than partial disappearance.[6] The statute is therefore inherently ambiguous, as it appears to use language in a manner in some tension with ordinary usage.
 
 1. The Secretary's Explanation
 
 22
 The Secretary's explanation of this odd phraseology is of no assistance in puzzling out the meaning of the phrase, since her interpretation simply cannot be squared with the statute's language and structure. The Secretary in her brief interprets the enigmatic phrase to mean that a species is eligible for protection under the ESA if it "faces threats in enough key portions of its range that the entire species is in danger of extinction, or will be within the foreseeable future." She therefore assumes that a species is in danger of extinction in "a significant portion of its range" only if it is in danger of extinction everywhere.[7]
 
 
 23
 If, however, the effect of extinction throughout"a significant portion of its range" is the threat of extinction everywhere, then the threat of extinction throughout"a significant portion of its range" is equivalent to the threat of extinction throughout all its range. Because the statute already defines "endangered species" as those that are "in danger of extinction throughout all . . . of [their] range, " the Secretary's interpretation of "a significant portion of its range " has the effect of rendering the phrase superfluous.
 
 
 24
 Such a redundant reading of a significant statutory phrase is unacceptable. When interpreting a statute, we must follow a "natural reading . . . , which would give effect to all of [the statute's] provisions." United Food and Commercial Workers Union Local 571 v. Brown Group, Inc., 517 U.S. 544, 549 (1996) (emphasis added). By reading "all" and"a significant portion of its range" as functional equivalents, the Secretary's construction violates that rule.
 
 
 25
 The Secretary tries to distinguish her definition of a species in danger "throughout . . . a significant portion of its range" from a species in danger "throughout all" its range by noting Congress' expressed commitment to long-term conservation and its hope that the ESA would protect species well before they reached the brink of extinction. The extension of ESA protections to a species in danger "throughout . . . a significant portion of its range," the Secretary asserts, offers protection to species not yet faced with imminent extinction and therefore reflects the incremental approach Congress intended the ESA to provide. But this function too is fulfilled elsewhere in the statute.
 
 
 26
 As noted, the ESA provides protection to both "endangered species" and "threatened species." While an "endangered species" is a species "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. §§ 1532(6), "threatened species" include those "which[are] likely to become . . . endangered species within the foreseeable future throughout all or a significant portion of [their ] range." 16 U.S.C. §§ 1532(20). The Secretary's interpretation thus conflates the distinct ESA protections for species facing extinction throughout "all" and throughout "a significant portion" of their range with the separate protections for "threatened" and for "endangered species." As such, the Secretary's construction once again views the statute as saying the same thing twice.
 
 
 27
 This understanding of the statutory language not only clashes with the rule against surplusage we have already discussed, but also runs up against the statute's legislative history.[8] Congress did recognize that, as the Secretary stresses,"[e]xtinction is a gradual process," but Congress incorporated that recognition not in the "significant portion" phrase but in the protection for "threatened" species. During the Senate floor debate, Senator Tunney of California observed that the ESA
 
 
 28
 provides protection to a broader range of species by affording the Secretary the power to list animals which he determines are likely in the foreseeable future to become extinct, as well as those animals which are presently threatened with extinction. This gives the Secretary and the States which adopt endangered species management plans, the ability not only to protect the last remaining members of the species but to take steps to insure that species which are likely to be threatened with extinction never reach the state of being presently endangered. 120 Cong. Rec. 25,668 (1973) (statement of Sen. Tunney) (emphasis added); see, also 16 U.S.C. §§ 1531(b) ("The purposes of this chapter are to provide a means whereby the eco-systems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." (Emphasis added)). Congress' desire to provide incremental protection to species in varying degrees of danger does not, therefore, explain the ESA's protection for species facing extinction throughout only "a significant portion of [their] range."
 
 2. Defenders' Explanation
 
 29
 Defenders' interpretation of the phrase "extinction through-out . . . a significant portion of its range" is similarly unsatisfactory. Defenders takes a more quantitative approach to the phrase, arguing that the projected loss of 82% of the lizard's habitat in this case constitutes "a substantial portion of its range." Appellants then cite to other cases in which courts found listing of species warranted after the loss of even smaller amounts of habitat. Federation of Fly Fishers v. Daley, Civ. No. 99-981-SI (N.D. Cal. Oct. 25, 2000), Slip Op. at 17-18 (finding listing of the steelhead trout warranted despite protections covering 64% of its range); ONRC v. Daley, 6 F.Supp. 2d 1139, 1157 (D. Or. 1998) (finding the coho salmon in danger of extinction despite federal forest land protections extending over 35% of its range); 45 Fed. Reg. 63,812, 63,817-18 (Sept. 25, 1980) (listing the Coachella Valley fringe-toed lizard as a threatened species although 50% of its historical habitat remained).
 
 
 30
 There are two problems with Defenders' quantitative approach. First, it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat.[9] As the examples cited by Defenders and noted above demonstrate, the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case by case basis. Furthermore, were a bright line percentage appropriate for determining when listing was necessary, Congress could simply have included that percentage in the text of the ESA.
 
 
 31
 In the absence of a fixed percentage, Defenders' suggested interpretation of the phrase begins to look a lot like the faulty definition offered by the Secretary, i.e., "a substantial portion of its range" means an amount of habitat loss such that total extinction is likely in the near future. As noted above, this reading does not comport with the other terms of the statute.
 
 3. Insight from the Legislative History
 
 32
 The legislative history of the ESA suggests an entirely different meaning of the inherently ambiguous phrase"extinction throughout . . . a significant portion of its range."
 
 
 33
 The ESA was actually the third in a series of laws enacted in the late 1960s and early 1970s aimed at protecting and preserving endangered species. The previous two, however, defined endangered species narrowly, including only those species facing total extinction. Neither extended protection to a species endangered in only a "significant portion of its range." See Endangered Species Conservation Act, Pub. L. 91-135 §§ 3(a), 83 Stat. 275 (Dec. 5, 1969) (describing endangered species as those threatened by "worldwide extinction"); Endangered Species Preservation Act, Pub. L. 89-669§§ 1(c), 80 Stat. 926 (Oct. 15, 1966) (describing an endangered species as one whose "existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance").
 
 
 34
 The ESA's broadened protection for species in danger of extinction throughout "a significant portion of[their] range" was thus a significant change. The House Report accompanying the bill acknowledged as much, noting that the new definition's expansion to include species in danger of extinction "in any portion of its range" represented "a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction." H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) (emphasis added).
 
 
 35
 It appears that Congress added this new language in order to encourage greater cooperation between federal and state agencies and to allow the Secretary more flexibility in her approach to wildlife management. The case of the American alligator, which was frequently cited during the Senate debate, illustrates this likely intent:
 
 
 36
 In 1973, the range of the alligator stretched from the Mississippi Delta in Louisiana to the Everglades of Florida. Its distribution over that range, however, varied widely. While habitat loss had pushed the species to the verge of extinction in Florida, conservation efforts had resulted in an overabundance of alligators in Louisiana, such that harvesting was required to keep the alligators from overrunning the human population. In order to address problems such as this, the Act allows the Secretary to "list an animal as `endangered' through all or a portion of its range." 62 Fed. Reg. 25,669 (July 25 1973). Senator Tunney explained:
 
 
 37
 An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction. In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.
 
 
 38
 Id. In describing this provision as "perhaps the most important section of this bill," id., Senator Tunney also noted that
 
 
 39
 The plan for Federal-State cooperation provides for much more extensive discretionary action on the part of the Secretary and the State agencies. Under existing law [(namely, the Endangered Species Conservation Act of 1969)], a species must be declared "endangered" even if in a certain portion of its range, the species has experienced a population boom, or is otherwise threatening to destroy the life support capacity of its habitat. Such a broad listing prevents local authorities from taking steps to insure healthy population levels.
 
 
 40
 Id.
 
 
 41
 The historical application of the Act is consistent with this interpretation of the statute, not with the interpretation suggested by the Secretary in her briefs in this case. Grizzly bears, for example, are listed as threatened species within the contiguous 48 states, but not in Alaska. Similarly, only the California, Oregon and Washington populations of the marbled murrelet, whose range in North America extends from the Aleutian Archipelago in Alaska to Central California, are listed as threatened. 57 Fed. Reg. 45,328 (Oct. 1, 1992). See also 63 Fed Reg. 13,134 (Mar. 18, 1998) (listing the desert bighorn sheep in the peninsular ranges of southern California, although not in the range extending into Baja California); 62 Fed Reg. 30,772 (June 5, 1997) (listing as endangered the population of Stellar sea lions occurring west of 144 degrees W. longitude, while continuing to list the remaining population as threatened); 52 Fed. Reg. 25,229 (July 6, 1987) (listing the Florida population of Audubon's crested caracara, a hawk that occurs from Florida, southern Texas and Arizona, and northern Baja California, south to Panama, as threatened); 50 Fed. Reg. 50,726 (Dec. 11, 1985) (listing the population of piping plovers as endangered in the watershed of the Great Lakes and threatened throughout the remainder of its range).[10]
 
 
 42
 We conclude, consistently with the Secretary's historical practice, that a species can be extinct "throughout . . . a significant portion of its range" if there are major geographical areas in which it is no longer viable but once was. Those areas need not coincide with national or state political boundaries, although they can. The Secretary necessarily has a wide degree of discretion in delineating "a significant portion of its range," since the term is not defined in the statute. But where, as here, it is on the record apparent that the area in which the lizard is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a "significant portion of its range." Asarco, Inc. v. EPA, 616 F.2d 1153, 1159 (9th Cir. 1980) ("A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors.").
 
 4. Application to This Case
 
 43
 As noted, the Secretary did not, in her Notice, expressly consider the "extinction throughout . . . a significant portion of its range" issue at all.[11] Had she applied the flexible standard we have adopted to the instant case, she might have determined that the lizard is indeed in danger of"extinction throughout . . . a significant portion of its range."
 
 
 44
 First, the habitat on private land may constitute"a significant portion of its range" demanding enhanced protections not required on public lands; alternatively, the inverse may be true. Second, and perhaps more persuasively given this interpretation of the statute, the lizard may face unique threats in either California or Arizona, or in major subportions of either state. Notably, the California Department of Fish and Game initially declined to sign the Conservation Agreement relied upon by the Secretary, suggesting perhaps that the lizard's habitat in the two states may require different degrees of protection.
 
 
 45
 The Secretary does not address at all in the Notice whether, on either of these bases, the lizard was "extinc[t] throughout . . . a significant portion of its range." This omission with respect to a significant legal issue raised by the factual circumstances would itself be a sufficient basis for remanding the case to the Secretary to consider the question. People of State of Cal. v. FCC, 39 F.3d 919, 925 (9th Cir. 1994) (we will reverse an agency action "if the record reveals that the agency has failed to consider an important aspect of the problem.") (internal quotation marks omitted). Further, the explanation of the Secretary's lawyers, even were we to consider it,[12] is, for the reasons already surveyed, flatly inconsistent with the statute.
 
 
 46
 Nor did the Secretary address the lizard's viability in a site-specific manner with regard to the putative benefits of the CA. Although the Notice asserts that "MAs have been designated in the" five areas identified in the CA, 62 Fed. Reg. 37860, there is evidence that, in at least three of those areas, the designation process was either incomplete or wholly unstarted at the time the Notice was issued. See 63 Fed. Reg. 16272; 63 Fed. Reg. 66561, 66561-62. Nowhere does the Secretary account for the effects of failure to implement the CA immediately in those areas where delay was expected. Thus, it is unclear how the benefits assertedly flowing from the CA affected any particular portion of the lizard's habitats, and accordingly unclear how the CA could have mitigated threats to the lizard throughout "a significant portion of its range." We therefore conclude that the Secretary's decision to withdraw the proposed rule designating the lizard as protected cannot be enforced on the basis of the Notice.
 
 III. Conclusion
 
 47
 For the foregoing reasons, we conclude that the Secretary's decision to withdraw the proposed rule recommending the lizard for ESA protection was arbitrary and capricious. We therefore REVERSE the district court's decision dismissing the Defenders' claim, with directions that the case be remanded to the Secretary for consideration in accord with the legal standards outlined in this opinion of the question whether the proposed rule listing the lizard as threatened should be withdrawn.
 
 
 
 Notes:
 
 
 *
 Gale Norton is substituted for Bruce Babbitt as Secretary of the Department of the Interior, pursuant to Fed. R. App. P. 43(c)(1).
 
 
 [1]
 The five factors the Secretary must consider when determining a species' eligibility for protection are: (A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; (E) other natural or manmade factors affecting[the species] continued existence. 16 U.S.C. §§ 1533(a)(1).
 
 
 [2]
 The Secretary may also delay a final decision for up to six months because of "substantial disagreement" in the scientific community regarding the "sufficiency or accuracy of the available data relevant to the determination or revision concerned." 16 U.S.C. §§ 1533(b)(6)(B)(i).
 
 
 [3]
 The FWS dropped the sub-categorization of candidates in 1996. 61 Fed. Reg. 7596, 7597-98 (Feb. 28, 1996).
 
 
 [4]
 A Resolution, H.R. 3019, granted the President authority to waive the moratorium at his discretion. See Jeffrey S. Kopf, Slamming Shut the Ark Doors: Congress's Attack on the Listing Process of the Endangered Species Act, 3 ANIMAL L. 103, 126 (1997).
 
 
 [5]
 The participating parties included the United States Fish and Wildlife Service, the United States Bureau of Land Management, The United States Bureau of Reclamation, the United States Marine Corps, the United States Navy, the Arizona Game and Fish Department, and the California Department of Parks and Recreation. The California Department of Fish and Game participated in the development of the Conservation Agreement but was not a signatory at the time the Secretary issued her withdrawal decision.
 
 
 [6]
 See also the Oxford English Dictionary's relevant definition of "extinction": 4. Of a race, family, species, etc.: The fact or process of becoming extinct; a coming to an end or dying out; the condition of being extinct.
 
 
 [7]
 As we explain later, the Secretary has at other times applied the statute inconsistently with her current interpretation.
 
 
 [8]
 When the plain language of a statute is ambiguous, courts may "examine the textual evolution of the [contested phrase] and the legislative history that may explain or elucidate it." United States v. R.L.C., 503 U.S. 291, 298 (1992).
 
 
 [9]
 The Secretary offers a compelling counter-argument to the Defenders' suggested approach: A reading of the phrase "significant portion of its range," that adopts a purely quantitative measurement of range and ignores fact-based examination of the significance of the threats posed to part of the species' range to the viability of the species as a whole, does not carry out the purpose of the statute. Such an interpretation would fail to protect species in danger of extinction because it might not allow listing of species where areas of range vital to the species' survival -but not the majority of the range -face significant threats. Additionally, this interpretation could erroneously result in listing of species that are in no danger of extinction merely because they no longer inhabit all of their historical range. This latter result would greatly multiply the listing of species and subject both federal agencies and private individuals to the requirements of the ESA, even though such species are self-sustaining in the wild and do not require the protective measures of the ESA.
 
 
 [10]
 The text of the ESA and its subsequent application seems to have been guided by the following maxim: There seems to be a tacit assumption that if grizzlies survive in Canada and Alaska, that is good enough. It is not good enough for me. . . . Relegating grizzlies to Alaska is about like relegating happiness to heaven; one may never get there. ALDO LEOPOLD, A SAND COUNTY ALMANAC 277 (1966).
 
 
 [11]
 Accordingly, we owe the Secretary's interpretation no deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). As the D.C. Circuit explained in analogous circumstances, deference "is not due when the [agency] has apparently failed to apply an important term of its governing statute. We cannot defer to what we cannot perceive." International Longshoremen's Ass'n, AFL-CIO v. National Mediation Bd., 870 F.2d 733, 736 (D.C. Cir. 1989). Nor do we owe deference to the interpretation of the statute now advocated by the Secretary's counsel -newly minted, it seems, for this lawsuit, and inconsistent with prior agency actions as we ordinarily will not defer "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212 (1988).
 
 
 [12]
 In general, "we cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001).