[No. C053866. Third Dist. Nov. 20, 2007.]

CALIFORNIA FORESTRY ASSOCIATION et al., Plaintiffs and Appellants,
v.
CALIFORNIA FISH AND GAME COMMISSION et al., Defendants and
Respondents;
CALIFORNIA TROUT, INC., et al. Interveners and Respondents.

1538

COUNSEL

Pacific Legal Foundation, James S. Burling and Damien M. Schiff for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Sara J. Russell, Tara L. Mueller and Matthew J. Goldman, Deputy Attorneys General, for Defendants and Respondents.

Kenyon Yeates, J. William Yeates, Keith G. Wagner and Jason R. Flanders for Interveners and Respondents.

## OPINION

**ROBIE, J.**—California has been at the forefront of enacting legislation to protect endangered and rare animals—first doing so in 1970. (*Natural Resources Defense Council v. Fish & Game Com.* (1994) 28 Cal.App.4th 1104, 1111 [33 Cal.Rptr.2d 904].) Fourteen years later, that legislation was repealed and replaced with the California Endangered Species Act (CESA) (Fish & G. Code,[1] § 2050 et seq.). (*Natural Resources Defense Council*, at p. 1111.)

In enacting the CESA, the Legislature made clear this state's policy to protect any endangered or threatened "species or subspecies" if at risk of extinction "throughout all, or a significant portion, of its range" (§§ 2052, 2062, 2067), but left undefined certain terms essential to implementing that policy. This appeal addresses the meaning of some of these terms in the context of protecting two "evolutionarily significant units" of coho salmon in California that defendants in this case—the California Fish and Game Commission (Commission) and the Department of Fish and Game (Department)—found to be endangered and threatened.

Among the issues we will address is whether the term "species or subspecies" includes "evolutionarily significant units," making those units entitled to protection under the CESA. We will also address whether the term "range" in the CESA refers to a species' California range only, thereby entitling a species to protection if it is threatened with extinction throughout all, or a significant portion, of its California range (as opposed to its worldwide range).

Consistent with the policy of the CESA, we will hold that the term "species or subspecies" includes evolutionarily significant units and that the term "range" refers to a species' California range only. In so holding, we

---

[1] All further statutory references are to the Fish and Game Code unless otherwise indicated.

will deny a challenge by plaintiffs—a coalition of California corporations[2]—to the trial court's ruling upholding the listing of two coho salmon evolutionarily significant units as endangered and threatened under the CESA.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

*California Endangered Species Act*

■  Under the CESA, the Commission must "establish a list of endangered species and a list of threatened species" and "add or remove species from either list if it finds, upon the receipt of sufficient scientific information . . . that the action is warranted." (§ 2070.) The CESA defines "endangered species" as "a native species or subspecies of a bird, mammal, fish, amphibian, reptile, or plant which is in serious danger of becoming extinct throughout all, or a significant portion, of its range due to one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, or disease." (§ 2062.) It defines "threatened species" similarly, except "that, although not presently threatened with extinction, [it] is likely to become an endangered species in the foreseeable future in the absence of the special protection and management efforts required by this chapter." (§ 2067.)

■  "[A]n interested person may petition the [C]ommission to add a species to, or to remove a species from either the list of endangered or the list of threatened species." (§ 2071.) The Commission refers the petition to the Department (§ 2073), which then evaluates the petition and submits a written evaluation report to the Commission (§ 2073.5, subd. (a)). In its report, the Department recommends either rejection of the petition or acceptance and consideration of the petition. (*Id.*, subd. (a)(1), (2).)

At its next noticed meeting (§§ 2074, 2078), the Commission "consider[s] the petition, the [D]epartment's written report, and comments received" and publishes notice of a finding that it has either rejected the petition or accepted the petition for consideration. (§ 2074.2, subd. (a)(1), (2).) "If the accepted petition recommends the addition of a species to either the list of endangered species or the list of threatened species, the [C]ommission shall include in the notice that the petitioned species is a candidate species." (*Id.*, subd. (a)(2).)

---

[2] Plaintiffs in this case are California Forestry Association, California Chamber of Commerce, California Cattlemen's Association, California State Grange, Forest Landowners of California, Greater Eureka Chamber of Commerce, and Save Our Shasta and Scott Valleys, Inc.

Within 12 months of publishing the notice, the Department must provide a status report to the Commission, "based upon the best scientific information available to the [D]epartment." (§ 2074.6.) The Department's status report is supplemented by public "solicit[ation] [of] data and comments . . . from as many persons as is practicable." (§ 2074.4.) The Commission then "schedule[s] the petition for final consideration at its next available meeting." (§ 2075.)

At that noticed meeting (§§ 2075, 2078, subd. (a)), the Commission makes a finding that the petitioned action is either warranted or not warranted. (§ 2075.5, subds. (1), (2).) "Before this 'finding[]' can be implemented as a formal rule, the Commission must also comply with the rulemaking provisions of the Administrative Procedure Act. (APA; Gov. Code, § 11340 et seq.) These call for public notice, comment, and hearing, as well as a written statement of reasons with response to public recommendations and objections, as specified by the APA. [Citations.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 140 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (dis. opn. of Baxter, J.).)

B

*Coho Salmon*

Coho salmon are known scientifically as *Oncorhynchus kisutch,* which derives from a combination of the Greek roots *onkos* (meaning hooked) and *rynchos* (meaning nose) and the colloquial name for the species in Russia and Alaska, *kisutch.* These medium to large salmon naturally occur in the north Pacific Ocean, tributary drainages, and freshwater drainages from Hokkaido, Japan, and eastern Russia, around the Bering Sea and Aleutian Islands to mainland Alaska, and south along the North American coast to Monterey Bay, California.

In California, there are two areas of "genetic discontinuity/transition" for coho salmon. These areas occur from Punta Gorda south to the San Lorenzo River—the Central California Coast coho evolutionarily significant unit (the Central Coast unit)—and from Punta Gorda north across the state border to Cape Blanco, Oregon—the Southern Oregon/Northern California Coast evolutionarily significant unit (the Southern Oregon/Northern California Coast unit). According to scientists quoted in the Department's status report, "these discontinuities represent areas of restricted gene flow that likely results in some level of reproductive isolation." "Isolated populations are subject to different levels of genetic drift and unique natural selection pressures that tend over time to result in differences between them."

According to other scientists, also quoted in the Department's status report, coho salmon have the lowest genetic diversity of the five Pacific salmon species, due possibly to "one or more severe reductions in population size." Studies have shown that the population of coho salmon in California, including hatchery stocks, has declined at least 70 percent since the 1960's. According to "presence surveys" in the Department's status report, the population of the Central Coast unit has severely declined in Central California to the point of "widespread extirpation or near-extinctions" within some larger stream systems. In comparison, the Southern Oregon/Northern California Coast unit appears in all major stream systems in Northern California, although most indicators show declines in that unit as well and a high likelihood that the declines will continue.

Reasons for the declining coho salmon population include forestry activities, industrial discharges, agricultural discharges, urban development, and harvesting.

C

*Proceedings in This Case*

In July 2000, the Salmon and Steelhead Recovery Coalition[3] petitioned the Commission to list coho salmon north of San Francisco Bay as an endangered species under the CESA. The Commission referred the petition to the Department for its evaluation, and the Department recommended "the petition be accepted and considered." The Commission accepted the petition and published notice declaring coho salmon north of San Francisco a candidate species.

In April 2002, the Department published its status report. As it had done with previous listings under the CESA, the Department separately evaluated the status of the two coho units. Based on scientific research detailed in the status report, the Department recommended adding the California portion of the Southern Oregon/Northern California Coast unit to the list of threatened species and the Central Coast unit to the list of endangered species.

In August 2002, in reliance on the Department's report, the Commission found that the California portion of the Southern Oregon/Northern California Coast unit warranted listing as a threatened species and the Central Coast unit warranted listing as an endangered species. The Commission delayed regulatory action while the Department prepared a recovery plan for the species.

---

[3] The coalition included the interveners in this case—California Trout Inc., Pacific Coast Federation of Fishermen's Associations, and Northcoast Environmental Center.

In August 2004, the Commission finally amended the existing regulations to list the California portion of the Southern Oregon/Northern California Coast unit as a threatened species and the Central Coast unit as an endangered species.

In June 2005, plaintiffs filed a petition for writ of mandate and a complaint for declaratory and injunctive relief challenging the Commission's listing decisions and the Commission's decision formally adopting the listing regulations pursuant to the rulemaking provisions of the APA.

In August 2006, the trial court issued a thorough and well-reasoned ruling denying the petition and the complaint. In its ruling, the trial court made the following four findings: (1) "the Commission acted properly by listing the [c]oho salmon in two distinct [evolutionarily significant units]"; (2) the Commission and the Department properly considered the coho salmon's California range in assessing the species' likelihood of extinction; (3) the Commission thoroughly considered the role of hatchery salmon in determining whether to list the two coho units as endangered and threatened; and (4) the Commission satisfied the necessity and nonduplication standards in the APA.

On appeal, plaintiffs challenge these four findings, asking this court to direct the trial court to issue a writ of mandate declaring the listing regulations void and precluding their enforcement. Disagreeing with plaintiffs that the trial court's findings were erroneous, we affirm the judgment.

## DISCUSSION

### I

### *Evolutionarily Significant Units*

The CESA defines "endangered species" and "threatened species" as "a native *species or subspecies* of a bird, mammal, fish, amphibian, reptile, or plant . . . ." (§§ 2062, 2067, italics added.) Plaintiffs contend this definition necessarily excludes evolutionarily significant units, and the Commission therefore erred in listing the two coho units as endangered and threatened species under the CESA.

The proper interpretation of a statute, and its application to undisputed facts, is a question of law that we review de novo. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722 [39 Cal.Rptr.3d 189].) In this de novo review, " '[o]ur fundamental task . . . is to ascertain the intent of

the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' " (*Wilson v. Handley* (2002) 97 Cal.App.4th 1301, 1306 [119 Cal.Rptr.2d 263].) While we exercise our independent judgment in interpreting a statute, we give deference to an agency's interpretation if warranted by the circumstances. (*State Water Resources Control Bd. Cases*, at pp. 722–723, citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

According to plaintiffs, the plain meaning of the term "species or subspecies" "necessarily excludes evolutionarily significant units." In their view, "[the CESA] expressly includes the one subset—subspecies—within the definitions of endangered and threatened species. Thus, the irresistible conclusion is that all other population segments below the level of species, including evolutionarily significant units, have been excluded from [the CESA]'s definitions of endangered and threatened species." Plaintiffs' argument is based on a narrow, scientific definition of "species or subspecies."

■ Defined broadly, a "species" is "a class of individuals having common attributes and designated by a common name" (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1198, col. 1) and a "subspecies" is a "subgroup" (*id.*, at p. 1245, col. 2). In nonscientific terms, therefore, it can be said that an evolutionarily significant unit of coho salmon is a subgroup of coho salmon. Since the term "species or subspecies" is also susceptible to this reasonable interpretation, the term is ambiguous in the context of the CESA, and we may look to extrinsic sources in construing the statute, keeping in mind that we must " 'choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute[s].' " (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at pp. 738–739.)

We begin with the basic premise that "[l]aws providing for the conservation of natural resources" such as the CESA "are of great remedial and public importance and thus should be construed liberally." (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 601 [51 Cal.Rptr.2d 897].) Within the CESA itself, the Legislature has "expressed the objects to be achieved and the evils to be remedied." (*San Bernardino Valley Audubon Society*, at p. 601, citing §§ 2051, 2052.) The evils to be remedied include the extinction of "[c]ertain species of fish, wildlife, and plants," and

the danger or threat of extinction of "[o]ther species of fish, wildlife, and plants." (§ 2051, subds. (a), (b).) The objects to be achieved include the "conserv[ation], protect[ion], restor[ation], and enhance[ment] [of] any endangered species or any threatened species." (§ 2052.)

Consistent with these objectives, the Commission, based on the Department's recommendation, listed the two coho units as endangered and threatened, because the Commission and the Department believed such listings were integral to maintaining the diversity of the species and therefore to protecting the species as a whole and because such listings were allowed under the CESA. As we will explain, deference to the Commission and the Department's interpretation of the term "species or subspecies" as including evolutionarily significant units is appropriate here given their central roles in the listing process, their scientific expertise, and their longstanding adherence to the policy that the CESA allows listings of evolutionarily significant units. (See *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 12–13.)

As we have stated, the Legislature entrusted the Commission with the responsibility for establishing the list of endangered and threatened species (§ 2070), and the Department with the responsibility for evaluating petitions, making recommendations to the Commission (§ 2073.5, subd. (a)) and "provid[ing] a written report to the [C]ommission, based upon the best scientific information available to the [D]epartment" (§ 2074.6). In carrying out its responsibilities, the Department stated in its initial evaluation that if coho salmon north of San Francisco became a candidate species, it would consider separately the two coho units found in California.

The concept of evolutionarily significant units was important because, as the Department explained, "the ability of coho salmon to survive and reproduce" was affected by "extinction of nearby populations [that] may minimize or prevent the exchange of individuals between populations that is necessary to avoid inbreeding and speciation." At the time of the Department's initial evaluation, there already was "information on overall population decline, low population abundance, loss or local populations, large-scale fragmentation and collapse of [the coho salmon's] range."

Consistent with its initial position, the Department in its April 2002 status review restated its view that the two coho units should be evaluated separately for listing purposes. The Department recognized that "[evolutionarily significant units] reflect the best current understanding of the likely boundaries of reproductively isolated salmon populations over a broad geographic area," that "[s]imilar populations can be grouped for efficient protection of

bio- and genetic diversity," and that "genetic structure and biodiversity among California stocks" were important "in evaluating and protecting coho salmon."

The Department explained in the status review why "biodiversity (and its genetic underpinnings)" were important to species' preservation. According to conservation biologists, quoted in the Department's status report, "diversity leads to greater abundance because different populations can exploit different habitats and resources"; "[d]iversity fosters enhanced long-term stability by spreading risk and providing redundancy in the face of unpredictable catastrophes" due to such things as "climatic or ocean condition fluctuation"; and "diversity provides a range of raw materials that allows adaptation and increased probability of persistence in the face of long-term environmental change."

In addition to believing that evolutionarily significant units were integral to protecting the species, the Commission and the Department believed that the Legislature meant to allow for the listing of such units under the CESA. As the Commission explained in response to public comments, its decision to list the two coho units was consistent with its decades-old policy allowing such listings that was ushered in by the Legislature when enacting the CESA. At that time, the Legislature provided that "[a]ny species determined by the [C]ommission as 'endangered' on or before January 1, 1985, is an 'endangered species.' " (§ 2062.) Pursuant to that provision, the Commission listed more than a dozen varieties of plants as "endangered species" "even though they did not comprise a specific or subspecific taxon, but rather [we]re subsets of a specific or subspecific taxon." For approximately 20 years since then, the Commission has listed additional varieties of plants and fish "all of which are subsets of a specific or subspecific taxon. . . ."

We believe deference to the Commission and the Department's interpretation of "species or subspecies" as including evolutionarily significant units is appropriate here. Their broad and longstanding interpretation, based on their scientific expertise, is consistent with the liberal construction we accord "[l]aws providing for the conservation of natural resources" (*San Bernardino Valley Audubon Society v. City of Moreno Valley, supra,* 44 Cal.App.4th at p. 601), and furthers the "conserv[ation], protect[ion], restor[ation], and enhance[ment] [of] any endangered species or any threatened species" (§ 2052) by maintaining the diversity of the species. In contrast, limiting the term to plaintiffs' interpretation frustrates the intent of the CESA because it fails to protect subgroups of a species that are integral to the species' survival.

Nevertheless, plaintiffs contend the listing of evolutionarily significant units is "unsupportable in light of the parallel experience" under the federal

Endangered Species Act of 1973 (FESA) (16 U.S.C. § 1531 et seq.), noting that the FESA's definition of species includes " 'distinct population segment[s],' " which encompasses evolutionarily significant units.[4] (See 16 U.S.C. § 1532(16); 56 Fed.Reg. 58612 (Nov. 20, 1991).) Plaintiffs argue that because the CESA "contains no language parallel to [the FESA]'s 'distinct populations segment' provision . . . this Court should be reluctant to read such language into [the CESA]." In support of their position, plaintiffs cite *San Bernardino Valley Audubon Society v. City of Moreno Valley, supra,* 44 Cal.App.4th at page 593. As we will explain, that case does not support plaintiffs' narrow reading of the term "species or subspecies."

There, the trial court determined that the Department could issue an incidental take permit of an endangered species for private development, even though at the time the CESA contained no provisions for issuing such permits. (*San Bernardino Valley Audubon Society v. City of Moreno Valley, supra,* 44 Cal.App.4th at pp. 597, 602–603.) Plaintiffs appealed, contending the CESA prohibited the take of endangered species incidental to private development, and the agreement by which the permit was issued violated that prohibition. (*San Bernardino Valley Audubon Society,* at p. 600.) While the Court of Appeal resolved the issue on the grounds of laches, it observed that were it to decide the issue on the merits, it would conclude the agreement by which the Department issued the permit was invalid. (*Id.* at p. 605.) The court reasoned that because the FESA, which "the [California] Legislature followed . . . in many respects when it enacted CESA," contained a "permit process allowing take incidental to development and other lawful activities" and that permit process existed before the drafting and passage of the CESA, "the [California] Legislature deliberately chose not to adopt that provision into the state statute." (*San Bernardino Valley Audubon Society,* at p. 604.) It is this language on which plaintiffs rely in making their argument. Plaintiffs' reliance on this language is misplaced.

■ Simply because the CESA does not include the definition of "species or subspecies" provided in the FESA, the necessary conclusion is not that evolutionarily significant units must be excluded for listing purposes under the CESA. More plausibly, given the Legislature's policy in enacting the CESA, it is reasonable to conclude that the Legislature did not want to limit the term "species or subspecies" to the federal definition. Instead, the Legislature likely may have wanted to leave the interpretation of that term to the Department, which is responsible for providing the "best scientific

---

[4] Specifically, the FESA defines "species" to "include[] any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." (16 U.S.C. § 1532(16).) "A salmon stock will be considered a distinct population, and hence a 'species' under [F]ESA, if it represents an evolutionary significant unit (ESU) of the biological species." (56 Fed.Reg. 58612 (Nov. 20, 1991).)

information" (§ 2074.6), and to the Commission, which is responsible for making the listing decisions (§ 2070). As we have already explained, deference to their interpretation is consistent with the liberal construction we accord laws such as the CESA and furthers the policy of that statute to "conserve, protect, restore, and enhance any endangered species or any threatened species" (§ 2052). For these reasons, we agree with the Commission and the Department that the term "species or subspecies" as used in sections 2062 and 2067 of the CESA includes evolutionarily significant units, and the Commission did not err in adding the two coho units to the list of endangered species and threatened species under the CESA.

II

*Range*

■ To be entitled to protection under the CESA, a species must be in serious danger of or likely to become in serious danger of extinction "throughout all, or a significant portion, of its range." (§ 2062; see § 2067.) Plaintiffs contend the trial court erred in accepting the Commission's and the Department's interpretation of this range provision as meaning the coho's *California* range, which allows protection of a species if it is threatened with extinction throughout all, or a significant portion, of its California range. Plaintiffs argue that the CESA requires the Commission and the Department to consider the coho's entire geographic range, "even those portions outside of California's boundaries." As we will explain, we agree with the Commission's and the Department's interpretation of the range provision as it is congruent with the CESA's purpose.

The CESA does not state whether the range to be considered is a species' California range or worldwide range. In this regard, the statute is ambiguous. As we explained in part I of the Discussion, *ante*, in interpreting an ambiguous statute, our fundamental task is to ascertain the intent of the Legislature to effectuate the purpose of the statute. (*Wilson v. Handley, supra*, 97 Cal.App.4th at p. 1306.) We exercise our independent judgment in interpreting a statute, but give deference to an agency's interpretation when warranted. (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at pp. 722–723, citing *Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at pp. 7–8.)

Central to plaintiffs' position is their assertion that under the CESA "[w]hat matters ultimately is whether the species goes extinct." They reason that the Commission's and the Department's interpretation of the range provision "may actually contribute to the species's demise, given that the protections of [the CESA] would be inapplicable within California notwithstanding the

species's endangerment outside of California, because that portion of the species's range would be legally irrelevant." The assertion on which plaintiffs base their position is not supported by the language of the CESA.

Contrary to plaintiffs' assertion, it is reasonable to infer that the CESA's focus is protecting species within the state, which is the extent of the state's regulatory authority. In enacting the CESA, the Legislature declared that endangered and threatened species were of "value to the people of *this state*, and the conservation, protection, and enhancement of these species and their habitat is of *statewide concern*." (§ 2051, subd. (c), italics added.) Interpreting the range provision to limit the inquiry into a species' likelihood of extinction in California furthers the Legislature's policy of protecting these species and their habitat *for the value of Californians*. In addition, the CESA limits protection of species or subspecies to those that are "native." (§§ 2062, 2067.) By narrowing the definition of endangered and threatened species to include only native species or subspecies, the Legislature demonstrated its intent that the CESA apply to protect species or subspecies within the state.

Notwithstanding this evidence of legislative intent, plaintiffs point to federal case law construing the FESA's range provision[5] that they believe supports their interpretation of the CESA's range provision. (See *Defenders of Wildlife v. Norton* (9th Cir. 2001) 258 F.3d 1136.) In that case, environmentalists challenged the Secretary of the Interior's decision not to designate as threatened under the FESA a species of lizard based on the secretary's reasoning that adequate habitat existed on public lands to ensure the lizard's viability and neutralize threats to the lizard on private lands. (*Defenders of Wildlife*, at pp. 1137–1138, 1140.) The Ninth Circuit interpreted the phrase "in danger of extinction throughout . . . a significant portion of its range" in the FESA to mean in danger of extinction throughout "major geographical areas in which [the species] is no longer viable but once was," explaining that "[t]hose areas need not coincide with national or state political boundaries, although they can." (258 F.3d at p. 1145.) The court went on to explain that although the "Secretary necessarily has a wide degree of discretion in delineating 'a significant portion of its range,' since the term is not defined in the statute," the secretary's decision was "arbitrary and capricious," because she did not address the " 'extinction throughout . . . a significant portion of its range' issue at all." (*Id.* at p. 1145.) Had she "applied the flexible standard" adopted in the case, "she might have determined that the lizard is indeed in

---

[5] The FESA's range provision also defines "endangered species" and "threatened species" with respect to a species' likelihood of extinction "throughout all or a significant portion of its range." (16 U.S.C. § 1532(6), (20).)

danger of 'extinction throughout . . . a significant portion of its range.' " (*Id.* at pp. 1145–1146.)

Contrary to plaintiffs' argument, this language supports the Commission's and the Department's interpretation of the CESA's range provision. Similar to the secretary's role in the FESA, the Commission and the Department have a wide degree of discretion in defining the phrase "throughout all, or a significant portion, of its range" since that phrase is not defined in the statute. But unlike in *Defenders of Wildlife*, the Commission's and the Department's interpretation of the range provision is entitled to deference because it "is congruent with the statute's language and obvious purpose." (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 777 P.2d 157].) As we have already explained, it is reasonable to infer that in enacting the CESA, the Legislature intended to protect species within the state, and limiting the inquiry into a species' likelihood of extinction in California furthers that intent.

It is no answer that, as plaintiffs retort, had the Legislature wanted to limit the range provision to an inquiry into the species' likelihood of extinction in California, it could have done so simply by defining endangered or threatened species with respect to its status throughout all, or a significant portion, of its range *within the state*, as some other states have done. (See, e.g., Ariz. Rev. Stat., § 17-296, subds. (3), (4) (2006); Colo. Rev. Stat., § 33-1-102, subd. (12) (2007); Or. Rev. Stat., § 496.004, subd. (6)(a) (2003); Wn. Admin. Code, § 232-12-297(2.4) (1990).) Although the Legislature can almost always make a statute more clear, that fact does little to resolve the ambiguity here. Just as easily, the Legislature could have defined "range" with respect to a species' *worldwide* range so as to comport with plaintiffs' interpretation of the statute. As an interpretive tool, then, language the Legislature could have added, but did not, is of little assistance here.

What matters in the final analysis is that the Commission's and the Department's interpretation of the range provision furthers the Legislature's intent of protecting native species and their habitat for the value of Californians. It is therefore appropriate for us to defer to that interpretation here, and hold, as the Commission and the Department found, that the term "range" as used in section 2062 refers to a species' California range. As such, the Commission and the Department did not err in considering the coho salmon's risk of extinction in California in determining whether the two coho units were entitled to protection under the CESA.

III

*Hatchery Coho Salmon*

In their analysis of coho salmon for listing purposes, the Commission and the Department considered the effect of hatchery coho salmon on naturally spawning or wild coho salmon in deciding whether to list the two coho units as endangered and threatened. Plaintiffs contend the Commission and the Department "improperly distinguished between naturally spawning and hatchery fish" because, in their view, the CESA "does not demand that naturally spawning—as opposed to hatchery raised—[c]oho be preserved. Rather, [the CESA]'s emphasis is on the species itself, not its origin." The fundamental premise on which plaintiffs base their argument is incorrect.

■ Contrary to plaintiffs' assertion, the Legislature intended that "wild fish," as opposed to hatchery fish, be protected under the CESA. While the definition of threatened species and endangered species in the CESA includes "native species or subspecies of a bird, mammal, fish, amphibian, reptile, or plant" (§§ 2062, 2067), the Legislature has narrowed the definition of "fish" to mean "wild fish" (§ 45). We therefore find inapposite plaintiffs' reliance on federal case law interpreting the FESA and deeming the Secretary of Commerce's decision to list only "naturally spawned" coho salmon (as opposed to "hatchery spawned" coho salmon) "arbitrary and capricious." (*Alsea Valley Alliance v. Evans* (D.Or. 2001) 161 F.Supp.2d 1154, 1157, 1159, 1163.) Leaving aside whether that case was correctly decided (see *Trout Unlimited v. Lohn* (W.D.Wn., June 13, 2007, CV06-0483-JCC) 2007 U.S.Dist. Lexis 42858, p. *25), "fish" in the FESA is not defined with reference to "wild fish" (16 U.S.C. § 1532(8)). Therefore, the Commission and the Department did not err in analyzing both wild coho salmon and hatchery coho salmon when determining whether the two coho units were entitled to protection under the CESA.

IV

*Necessity and Nonduplication Under the Administrative Procedure Act*

■ The APA was created because the Legislature perceived "there existed too many regulations imposing greater than necessary burdens on the state and particularly upon small businesses." (*Voss v. Superior Court*

(1996) 46 Cal.App.4th 900, 909 [54 Cal.Rptr.2d 225].) It allows "[a]ny interested person" to "obtain a judicial declaration as to the validity of any regulation or order of repeal by bringing an action for declaratory relief in the superior court." (Gov. Code, § 11350, subd. (a).) A court "may" declare a regulation "to be invalid for a substantial failure to comply with this chapter . . . ." (*Ibid.*) Included in the APA are a "necessity"[6] standard and a "nonduplication"[7] standard with which the agency proposing the regulation must comply. (Gov. Code, § 11349, subds. (a), (f).)

Plaintiffs contend the two coho unit listings are not necessary and are duplicative because the purpose of the CESA is already served by the FESA; the FESA provides greater protection to coho salmon than the CESA; and "many other federal and state statutes protect the [c]oho salmon." For the reasons that follow, we reject plaintiffs' contentions.

Although plaintiffs have conflated the two standards, necessity and nonduplication as used in the APA are distinct. The nonduplication standard requires identification of "any state or federal statute or regulation" to check for "overlap[] or duplicat[ion] by the proposed regulation." (Gov. Code, § 11349, subd. (f).) The necessity standard, on the other hand, requires demonstration that the record contains "substantial evidence [of] the need for a regulation to effectuate the purpose of the statute . . . that the regulation implements." (*Id.*, subd. (a).) It could be argued (and indeed plaintiffs appear to argue) that a regulation that *duplicates* a statute or another regulation is not *necessary*, and therefore the necessity and nonduplication standards are themselves duplicative. We believe, however, that the necessity standard can, and should, be understood in a manner that renders it distinct from the nonduplication standard. Specifically, a regulation can be understood as being necessary to effectuate the purpose of a statute (or

---

[6] " 'Necessity' means the record of the rulemaking proceeding demonstrates by substantial evidence the need for a regulation to effectuate the purpose of the statute, court decision, or other provision of law that the regulation implements, interprets, or makes specific, taking into account the totality of the record. For purposes of this standard, evidence includes, but is not limited to, facts, studies, and expert opinion." (Gov. Code, § 11349, subd. (a).)

[7] " 'Nonduplication' means that a regulation does not serve the same purpose as a state or federal statute or another regulation. This standard requires that an agency proposing to amend or adopt a regulation must identify any state or federal statute or regulation which is overlapped or duplicated by the proposed regulation and justify any overlap or duplication. This standard is not intended to prohibit state agencies from printing relevant portions of enabling legislation in regulations when the duplication is necessary to satisfy the clarity standard in paragraph (3) of subdivision (a) of Section 11349.1. This standard is intended to prevent the indiscriminate incorporation of statutory language in a regulation." (Gov. Code, § 11349, subd. (f).)

other provision of law) if the statute itself is not entirely self-implementing. In other words, if the purpose of a statute cannot be fully effectuated without the promulgations of implementing regulations, then there is a "need for a regulation to effectuate the purpose of the statute," and the necessity standard is met by an implementing regulation—regardless of the existence of other laws or regulations that might require examination under the nonduplication standard.

■ With this understanding of the necessity standard in mind, it becomes clear that a necessity challenge will never lie to a regulation listing an endangered species or threatened species under the CESA because that statute is not self-implementing; rather the CESA requires adoption of regulations to implement the statute's purpose, that is, the listing or delisting of species. (§ 2070.) The two coho unit listings in this case are therefore "necessary" as the term is properly understood in the APA, and plaintiffs' argument based on necessity fails.

We turn then to nonduplication. When the Commission amended the existing regulations in August 2004 to list the California portion of the Southern Oregon/Northern California Coast unit as a threatened species and the Central Coast unit as an endangered species under the CESA, these units were already listed for protection under the FESA. The Central Coast unit was listed under the FESA in 1996 (61 Fed.Reg. 56138 (Oct. 31, 1996)) and the entire Southern Oregon/Northern California Coast unit was listed under the FESA in 1997 (62 Fed.Reg. 33038 (June 18, 1997)). Plaintiffs contend the CESA listings duplicate the FESA's listings because the purpose of the CESA is already served by the FESA. They are wrong.

Our interpretation of the range provision in the CESA, as explained in part II of the Discussion, *ante*, makes clear that the purpose of the CESA is narrower than the purpose of the FESA. The CESA is concerned with protecting a species from extinction in *California*, while the FESA's concern is not limited to protecting a species within this state. As such, plaintiffs' argument that the listings of the two coho units under the CESA violate the nonduplication standard because state listings serve the same purpose as the federal listings fails.

Even if it could be argued that the CESA and the FESA serve the same general purpose, any duplication or overlap was justified in this case. As stated, the CESA is concerned with protecting a species from extinction in California. It follows then, that before issuing an incidental take permit under the CESA, the Department must analyze whether issuance of the state take permit "would jeopardize the continued existence" (§ 2081, subd. (c)) of the two coho units *in California*. In contrast, under the FESA, the secretary need

not analyze the effect of the issuance of the federal take permit on the two coho units solely in California but, rather, may determine that no jeopardy to the species would occur if it continued to survive and recover (16 U.S.C. § 1539(a)(2)(B)(iv)) in areas outside of California.

The Department presented evidence in the status review that a 2001 presence survey showed a substantial reduction in the number of historical streams occupied by salmon in the Southern Oregon/Northern California Coast unit and the Central Coast unit. The Department also presented evidence that the coho salmon's decline was due, in part, to forestry activities, industrial discharges, agricultural discharges, urban development, and harvesting.

Given this evidence and the difference in the reach of the take provisions of the CESA and the FESA, it was reasonable for the Commission to infer that listing the two coho units under the CESA would help halt the decline of the coho salmon in California. As such, plaintiffs' challenge to the Commission's and the Department's alleged failure to substantially comply with the nonduplication standard lacks merit.[8]

We note one final point. It may be that regulations listing endangered and threatened species under the CESA for which the same species are listed under the FESA always are justified, because a listing regulation under the CESA ensures that a species remains protected in California if the same species is delisted under the FESA. We can envision a scenario in which a species is delisted under the FESA because it is flourishing in areas outside of California but is still declining in California. Already having in place a CESA listing of the same species would ensure continued protection of the species in California without having to endure the lengthy wait for a species to move from petition status to listing status.[9] If the species were not already listed under the CESA, it could suffer a dramatic decline in population during the time it takes for the Commission to amend the existing regulations to list the species, undermining the purpose of the CESA.

---

[8] In a cursory fashion, plaintiffs argue that "many other federal and state statutes protect the [c]oho salmon," and then cite, without analysis, to a number of those statutes. This is not enough to carry their burden to prove that the Commission and the Department did not comply with the nonduplication standard. When an appellant challenges an administrative decision " 'it is [the] appellant's burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision.' " (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 749.) Thus, before this court, it is not the Commission's or the Department's responsibility to prove that it substantially complied with the nonduplication standard, it is the responsibility of the plaintiffs to prove the Commission and the Department did not. Plaintiffs have not carried that burden.

[9] Indeed, in this case it took approximately four years for the two coho units to be listed as endangered and threatened under the CESA.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(2).)

Raye, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied December 10, 2007, and appellants' petition for review by the Supreme Court was denied February 13, 2008, S159453. Baxter, J., was of the opinion that the petition should be granted.