[No. C055801. Third Dist. Dec. 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN F. ROSCOE et al., Defendants and Appellants.

## Counsel

Bernheim, Gutierrez & McCready and William S. Bernheim for Defendant and Appellant John F. Roscoe.

Gibson, Dunn & Crutcher, Brett H. Oberst and Patrick W. Dennis for Defendant and Appellant Ned F. Roscoe.

Jan Scully, District Attorney, Albert C. Locher, Assistant District Attorney, Charles Gonzales and Elise Sumnicht, Deputy District Attorneys, for Plaintiff and Respondent.

Edmund G. Brown, Jr., Attorney General, Gordon Burns, Deputy State Solicitor General, Mary E. Hackenbracht, Assistant Attorney General, Sara J. Russell and Tracy L. Winsor, Deputy Attorneys General, for State Water Resources Control Board as Amicus Curiae on behalf of Plaintiff and Respondent.

## Opinion

**ROBIE, J.**—The responsible corporate officer doctrine was developed by the United States Supreme Court to hold corporate officers in responsible positions of authority personally liable for violating strict liability statutes protecting the public welfare. (Hustis & Gotanda, *The Responsible Corporate Officer: Designated Felon or Legal Fiction?* (1994) 25 Loy. U. Chi. L.J. 169, 176, citing *United States v. Dotterweich* (1943) 320 U.S. 277 [88 L.Ed. 48, 64 S.Ct. 134] (*Dotterweich*); and *United States v. Park* (1975) 421 U.S. 658

[44 L.Ed.2d 489, 95 S.Ct. 1903] (*Park*).) It is a common law theory of liability separate from piercing the corporate veil or imposing personal liability for direct participation in tortious conduct. (*Celentano v. Rocque* (2007) 282 Conn. 645 [923 A.2d 709, 721, fn. 11].)

The trial court here used the responsible corporate officer doctrine to impose $2,493,250 in monetary civil penalties on two individuals (defendants John F. Roscoe and Ned F. Roscoe; hereafter the Roscoes) who were officers, directors, and shareholders of a family company for an underground storage tank that leaked over 3,000 gallons of gasoline into the ground. The family company that "owned and operated" the tank was also held jointly and severally liable.

■ The majority of the monetary penalties were imposed pursuant to the laws governing underground storage of hazardous substances, which we collectively refer to as the tank laws. (Health & Saf. Code,[1] § 25280 et seq.) The main statute of the tank laws at issue here is section 25299, subdivision (a)(6), which imposes on "[a]ny operator of an underground tank system" "a civil penalty of not less than five hundred dollars ($500) or more than five thousand dollars ($5,000) for each underground storage tank for each day of violation for" "[v]iolation of . . . any regulation adopted by the [State Water Resources Control B]oard . . . ."

We hold that the responsible corporate officer doctrine applies to section 25299, subdivision (a)(6), part of the tank laws, and thus subjects to liability as an "operator" a corporate officer who has "a responsible share in the furtherance of the transaction which the statute outlaws" (*Dotterweich, supra,* 320 U.S. at p. 284 [88 L.Ed. at p. 53]), even where the corporation itself is also found to be the operator.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1994 an underground storage tank owned and operated by The Customer Company leaked over 3,000 gallons of gasoline into the ground in the City of Galt. The Customer Company was a family company in which the Roscoes were officers, directors, and shareholders. After the leak occurred, employee John Johnson notified the Sacramento County Environmental Management Department (the department) about the leak, and consultant Parker Environmental Services was eventually hired to oversee the remediation.

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

Cleanup of the leak did not proceed timely and adequately, however, and the department sent multiple notices to The Customer Company that it was violating federal and state statutes and regulations. These notices were opened by John Roscoe, who considered them to be "form letters," which he passed on to employee Johnson. When Johnson received the notices, he referred them to Jim Parker "to find out how to resolve the matter." Johnson did nothing further, and nobody else from The Customer Company attempted to make sure the problems were addressed.

In 2002, the Sacramento County District Attorney filed a civil lawsuit against The Customer Company and the Roscoes (among others) for violating the tank laws. The lawsuit alleged, among other things, that The Customer Company and the Roscoes failed to submit mandatory work plans for source removal of an existing unauthorized fuel release, failed to take or contract for mandatory interim remedial actions to abate or correct the effects of the unauthorized fuel release, failed to submit appropriate work plans, and failed to timely submit mandatory quarterly reports.

After a 12-day bench trial, the trial court issued a 44-page statement of decision holding The Customer Company and the Roscoes jointly and severally liable for $2,493,250 in penalties.[2] The court based its holding of the corporation's liability on a finding that The Customer Company "was in fact the owner and operator of the tank at the time the leak occurred . . . ." The court based its holding of the Roscoes' personal liability on the responsible corporate officer doctrine. The court found that "overall authority for company affairs was retained by John and Ned Roscoe." They could have prevented or remedied promptly the noticed violations of the regulations, but they did not "exercise their responsibilities and power to use all objectively possible means to discover, prevent, and remedy any and all violations." Had a timely cleanup operation occurred, the cost likely would have been approximately $400,000 instead of the $1.5 million already paid by the State of California Underground Storage Cleanup Fund.

---

[2] The court calculated the $2,493,250 in penalties as follows: $144,000 ($500 per day for 288 days) for not submitting mandatory work plans; $1,455,000 ($1,000 per day for 1,455 days) for not taking or contracting for mandatory interim remedial action; $18,500 ($500 per day for 37 days) for failing to submit a mandatory work plan for installation of monitoring wells; $35,500 ($500 per day for 71 days) for failing to submit mandatory quarterly reports; $89,500 ($500 per day for 179 days) for failing to submit quarterly reports; $162,500 ($500 per day for 325 days) for failing to submit quarterly reports; and $588,750 ($250 per day for 2,355 days) for engaging in unfair business practices by committing statutory and regulatory violations. Although not raised by the parties, these figures add up to $2,493,750.

The Roscoes appeal the judgment. Providing only a clerk's transcript, they contend generally: (1) the court erred in applying the responsible corporate officer doctrine to hold them personally liable; and (2) the penalties imposed were excessive.

As explained below, we disagree with both contentions.

## DISCUSSION

### I

*The Responsible Corporate Officer Doctrine Applies to the Tank Law Violations at Issue Here and the Roscoes Are Personally Liable Under That Doctrine*

The Roscoes contend the court erred in applying the responsible corporate officer doctrine to hold them personally liable for violations of the tank laws. They argue the doctrine should not be applied to civil cases, cannot be applied to them because the trial court found The Customer Company to be the owner and operator of the tank, and cannot be applied where there is no evidence of wrongful conduct. As we will explain, the Roscoes are mistaken on all counts.

We begin with the language of the tank law statutes at issue here. Section 25299, subdivision (a)(6) reads in pertinent part: "Any operator of an underground tank system shall be liable for a civil penalty of not less than five hundred dollars ($500) or more than five thousand dollars ($5,000) for each underground storage tank for each day of violati[ng]" "any regulation adopted by the [State Water Resources Control B]oard . . . ."[3] For purposes of the tank laws, an operator is "any person in control of, or having daily responsibility for, the daily operation of an underground storage tank system." (§ 25281, subd. (j).) A person is "an individual, trust, firm, joint stock company, corporation, including a government corporation, partnership, limited liability company, or association. 'Person' also includes any city, county, district, the state, another state of the United States, any department or agency of this state or another state, or the United States to the extent authorized by federal law." (§ 25281, subd. (*l*).)

---

[3] The regulations the Roscoes violated were requirements to submit mandatory work plans and quarterly reports (Cal. Code Regs., tit. 23, §§ 2722, subds. (c), (d), 2652, subd. (d)) and take or contract for mandatory interim remedial actions (Cal. Code Regs., tit. 23, § 2722, subd. (b)).

Using section 25299 as the operative statute, the trial court held the Roscoes personally liable under the responsible corporate officer doctrine. The roots of this doctrine are found in the Supreme Court cases of *Dotterweich* and *Park*. (*U.S. v. Iverson* (9th Cir. 1998) 162 F.3d 1015, 1023–1024.)

In *Dotterweich*, the Supreme Court addressed whether the president/ general manager of a corporation, as well as the corporation itself, could be liable under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.; the Act), which imposed criminal liability on " '[a]ny person' " shipping adulterated or misbranded drugs. (*Dotterweich, supra*, 320 U.S. at p. 278 [88 L.Ed. at p. 50].) The federal appellate court had reversed Dotterweich's conviction on the ground that only the company was the " 'person' " subject to prosecution unless the company "was a counterfeit corporation serving as a screen for Dotterweich." (*Dotterweich*, at p. 279 [88 L.Ed. at p. 51].) The Supreme Court disagreed and held that the offense is committed by all who have "a responsible share in the furtherance of the transaction which the statute outlaws." (*Dotterweich*, at p. 284 [88 L.Ed. at p. 53].) Central to the court's holding was that the Act was public welfare legislation and the statute imposed strict liability. (*Dotterweich*, at pp. 280–281 [88 L.Ed. at p. 51].) Specifically, the Act extended the range of Congress's "control over illicit and noxious articles and stiffened the penalties for disobedience," thus "touch[ing] phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." (*Dotterweich*, at p. 280 [88 L.Ed. at p. 51].) And the statute allowed for criminal conviction without proof of "awareness of some wrongdoing," thus "put[ting] the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." (*Dotterweich*, at p. 281 [88 L.Ed. at p. 51].)

The Supreme Court further explained why Dotterweich, and not just the corporation, was liable. "The statute makes 'any person' who violates [it] guilty of a 'misdemeanor.' It specifically defines 'person' to include 'corporation.' [Citation.] But the only way in which a corporation can act is through the individuals who act on its behalf. . . . If, then, Dotterweich is not subject to the Act, it must be solely on the ground that individuals are immune when the 'person' who violates [the statute] is a corporation, although from the point of view of action the individuals are the corporation." (*Dotterweich, supra*, 320 U.S. at p. 281 [88 L.Ed. at p. 52].) The court examined the evolution of the establishment of criminal liability for a corporation, noting that it had "taken time to establish criminal liability also for a corporation and

not merely for its agents" and were the court to hold the Act freed all individuals, except when proprietors, from culpability, such a holding would "defeat the very object of the new Act," which was "designed to enlarge and stiffen the penal net and not to narrow and loosen it." (*Dotterweich*, at pp. 281–282 [88 L.Ed. at p. 52].)

Using this reasoning, the court found that Dotterweich had "a responsible share in the furtherance of the transaction which the statute outlaws" (*Dotterweich, supra*, 320 U.S. at p. 284 [88 L.Ed. at p. 53]), even though he "had no personal connection with either shipment [of misbranded and adulterated drugs]" and was simply "in general charge of the corporation's business and had given general instructions to its employees to fill orders received from physicians" (*United States v. Buffalo Pharmacal Co.* (2d Cir. 1942) 131 F.2d 500, 501, revd. *sub nom. Dotterweich*, at p. 285 [88 L.Ed. at p. 54]).

The Supreme Court further defined the scope of the responsible corporate officer doctrine over 30 years later in *Park*. There, the court considered whether the chief executive officer of a national corporation with approximately 36,000 employees was subject to liability under the act for storage of food that had become contaminated by rodents. (*Park, supra*, 421 U.S. at p. 660 [44 L.Ed.2d at p. 494].) Park had argued he was not liable because he "employed a system in which he relied upon his subordinates" even though he was "ultimately responsible for this system." (*Park*, at p. 677 [44 L.Ed.2d at p. 503].) Finding he was liable, the court enunciated the following standard for corporate officer liability under the Act: "the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link. The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability." (*Park*, at pp. 673–674 [44 L.Ed.2d at p. 502].)

In the years following *Dotterweich* and *Park*, lower federal courts have applied the responsible corporate officer doctrine to other federal statutes, including the Clean Water Act (33 U.S.C. § 1251 et seq.) (*U.S. v. Iverson, supra*, 162 F.3d at p. 1024) and the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901–6991) (*United States v. Johnson & Towers, Inc.*

(3d Cir. 1984) 741 F.2d 662, 666–667). Similarly, state courts have applied the doctrine to state statutes, including California's Hazardous Waste Control Act (§ 25100 et seq.) (*People v. Matthews* (1992) 7 Cal.App.4th 1052, 1057–1062 [9 Cal.Rptr.2d 348]), Minnesota's hazardous waste laws (*Matter of Dougherty* (Minn.Ct.App. 1992) 482 N.W.2d 485, 488–491), Indiana's Environmental Management Act (*Com'r, Dept. of Envir. Management v. RLG* (Ind. 2001) 755 N.E.2d 556, 558), Washington's Water Pollution Control Act (*Department of Ecology v. Lundgren* (1999) 94 Wn.App. 236 [971 P.2d 948, 951–953]) and Wisconsin's solid and hazardous waste laws (*State v. Rollfink* (1991) 162 Wis.2d 121 [475 N.W.2d 575, 576]).

█ With this background in mind, we turn to whether the responsible corporate officer doctrine applies to the tank law violations here. Similar to the statute at issue in *Dotterweich*, section 25299, subdivision (a)(6) is a strict liability statute because it imposes penalties on any operator of an underground tank system for violation of regulations adopted by the State Water Resources Control Board without any mens rea.[4] (*Dotterweich, supra,* 320 U.S. at p. 281 [88 L.Ed. at p. 51].) Also similar to *Dotterweich*, the Roscoes contend the corporation was the only operator subject to prosecution because the trial court found the corporation to be "the owner and operator of the tank at the time the leak occurred." (See *Dotterweich*, at p. 279 [88 L.Ed. at p. 51].) The Roscoes' contention would be persuasive if an individual corporate officer is immune from liability when the operator that violates section 25299, subdivision (a)(6) is a corporation. (See *Dotterweich*, at p. 281 [88 L.Ed. at p. 52].) To determine whether this is true, we turn first to the statutory language at issue. (*See California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1544–1545 [68 Cal.Rptr.3d 391] [the first step in any statutory analysis is to examine the language of the statute; if there is no ambiguity, the plain meaning governs].)

The plain language of the statutes does not readily answer whether a corporate officer is immune from liability under the responsible corporate officer doctrine if the corporation has been found to be the operator. On one hand, section 25299, subdivision (a)(6) does not limit liability to a single operator; rather it imposes liability on "[a]ny operator." Similarly, section 25281, subdivision (j) does not define operator as "the person" in control of or having daily responsibility for the tank; rather it defines operator as "any

---

[4] It is irrelevant that the statute imposes civil liability instead of criminal liability. "[T]he critical concern here is whether the parties responsible under the [tank laws] include persons such as [the Roscoes]. Whether a proceeding is criminal, civil, or administrative in nature does not vary the meaning of terms such as . . . 'operator.'" (*Liquid Chemical Corp. v. Department of Health Services* (1991) 227 Cal.App.3d 1682, 1706 [279 Cal.Rptr. 103].)

person." This broad language could be read as supporting imposition of liability on both the corporate officer and the corporation when appropriate. On the other hand, section 25281, subdivision (*l*) does not specifically include a corporate officer in the definition of person. This could be read as a limitation on a corporate officer's liability.

To resolve this ambiguity, we look to extrinsic sources in construing the statutes, "keeping in mind that we must ' "choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute[s]." ' " (*California Forestry Assn. v. California Fish & Game Commission, supra*, 156 Cal.App.4th at p. 1545.)

In enacting the tank laws, the Legislature found and declared, "The protection of the public from releases of hazardous substances is an issue of statewide concern." (§ 25280, subd. (a)(5).) It therefore is in "the public interest" "to establish orderly procedures that will ensure . . . existing tanks be properly maintained, inspected, tested, and upgraded so that the health, property, and resources of the people of the state will be protected." (§ 25280, subd. (a)(5)(b).) Using language from *Dotterweich*, "Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." (*Dotterweich, supra*, 320 U.S. at p. 280 [88 L.Ed. at p. 51].)

Consistent with these purposes, the Legislature has repeatedly amended the tank laws to cast a broader net of liability by expanding the definition of person and operator. For example, when section 25280 was adopted in 1983, it contained narrower definitions of person and operator. Specifically, former section 25280 defined a person as any "individual, trust, firm, joint stock company, corporation, including a government corporation, partnership, and association." (Stats. 1983, ch. 1046, § 3, p. 3677.) Person also included "any city, county, district, the state, or any department or agency thereof." (*Ibid.*) Operator meant "the operator of an underground storage tank." (Stats. 1983, ch. 1046, § 3, p. 3679.) One year later, the Legislature expanded the definition of person to include "the United States, to the extent authorized by federal law." (Stats. 1984, ch. 1038, § 2, p. 3598.) In 1989, the Legislature expanded the definition of operator to read "any person in control of, of having daily responsibility for, the daily operation of an underground storage tank system." (Stats. 1989, ch. 1397, § 3, p. 6078.) In 1994, the Legislature expanded the definition of person again to include a "limited liability company." (Stats. 1994, ch. 1200, § 35, p. 7368.) And in 1999, it expanded the definition yet another time to include "another state, or the United States." (Stats. 1999, ch. 328, § 1.) This expansion of the persons subject to liability strongly indicates the Legislature's intent was to increase the reach of the tank laws instead of narrow it.

■ Based on the legislative history of the tank laws, specifically their purposes and the evolution of the statutory language, section 25299, subdivision (a)(6) is the type of strict liability public welfare statute about which the court in *Dotterweich* was concerned when articulating that a corporate officer can be held "responsible" without "awareness of some wrongdoing." (*Dotterweich, supra*, 320 U.S. at pp. 280–281 [88 L.Ed. at p. 51].) We therefore hold that the responsible corporate officer doctrine applies to section 25299, subdivision (a)(6) of the tank laws and subjects to liability as "[a]ny operator" a corporate officer who has "a responsible share in the furtherance of the transaction which the statute outlaws." (*Dotterweich*, at p. 284 [88 L.Ed. at p. 53].)

■ Our holding leaves the question of whether the trial court properly held the Roscoes liable under that doctrine. "Three essential elements must be satisfied before liability will be imposed upon a corporate officer under the responsible corporate officer doctrine: (1) the individual must be in a position of responsibility which allows the person to influence corporate policies or activities; (2) there must be a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations." (*Matter of Dougherty, supra*, 482 N.W.2d at p. 490; see also *Com'r, Dept. of Envir. Management v. RLG, supra*, 755 N.E.2d 556, 561; *BEC Corp. v. Dept. of Environmental Protection* (2001) 256 Conn. 602 [775 A.2d 928, 937–938]; *In re Tehama Market Associates* (Central Valley Regional Water Quality Control Bd. 2007) Order No. R5-2007-0054, p. 3 [all following *Dougherty*'s articulation of the *Dotterweich/Park* analysis].)

Application of these elements is simplified here because the Roscoes have provided us only with a clerk's transcript. In this judgment roll appeal, therefore, we presume the trial court's findings of fact and conclusions of law are supported by substantial evidence. (*Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 924 [57 Cal.Rptr.2d 917].) They are binding on us, unless reversible error appears in the record. (*Ibid.*) No reversible error appears here because the following factual findings made by the trial court are sufficient to satisfy the three elements: The Roscoes retained "overall authority for company affairs." They could have prevented or remedied promptly the noticed violations of the regulations. And they did not "exercise their responsibilities and power to use all objectively possible means to discover, prevent, and remedy any and all violations." Based on these factual findings, the trial court did not err in holding the Roscoes personally liable for violations of the tank laws.

## II

### *The Penalties Were Not Excessive*

The Roscoes contend the penalties were "excessive," citing California case law regarding the principle of proportionality. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 [36 Cal.Rptr.3d 814, 124 P.3d 408].)[5] At oral argument, recognizing the difficult procedural posture he was in to make this argument because of the limited record the Roscoes provided on appeal, counsel for Ned Roscoe couched this argument in terms of what he contends are *legal* deficiencies on the face of the statement of decision. Namely, he argued that the statement of decision failed to take into account how the $2,493,250 in penalties furthered the goals of the tank laws and it failed to take into account the proportionality analysis as applied to Ned and John Roscoe individually. He further argued the statement of decision simply recounted the days over which the violations occurred and assigned a dollar figure per day to arrive at the total amount of penalties.

These arguments regarding the purported inadequacy of the statement of decision were not raised in the opening brief and are therefore forfeited. The requirements that issues be raised in the opening brief and presented under a separate argument heading, showing the nature of the question to be presented and the point to be made, are part of the " '[o]bvious considerations of fairness' " to allow the respondent its opportunity to answer these arguments (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788]) and also " 'to lighten the labors of the appellate [courts] by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass' " (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263]). (See also Cal. Rules of Court, rule 8.204(a)(1)(B).)

In any event, the arguments as to the alleged legal sufficiency of the statement of decision and the excessive nature of the penalties imposed fail on their merits.

The statement of decision correctly recounted the intent of the tank laws and correctly recounted the applicable law. Specifically, the court in the statement of decision stated the intent of the tank laws was "to establish

---

[5] The four factors in a proportionality analysis are: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 37 Cal.4th at p. 728.)

orderly procedures that will ensure . . . existing tanks be properly maintained, inspected, tested, and upgraded so that the health, property, and resources of the people of the state will be protected." (§ 25280, subd. (a)(5)(b).) It then stated the mandatory penalties for "[a]ny operator of an underground tank system" were "not less than five hundred dollars ($500) or more than five thousand dollars ($5,000) for each underground storage tank for each day of violation." (§ 25299, subd. (a).) It followed this recital with the requirements of the Health and Safety Code that "[i]n determining . . . the civil and criminal penalties imposed pursuant to this section, . . . the court . . . *shall consider all relevant circumstances*, including, but not limited to, the extent of harm or potential harm caused by the violation, the nature of the violation and the period of time over which it occurred, the frequency of past violations, and the corrective action, if any, taken by the person who holds the permit." (§ 25299, subd. (g), italics added.)

The court then found the Roscoes bore individual culpability in this case and that imposing penalties on them served the purposes of the tank laws. They retained "overall authority for company affairs," could have prevented or remedied promptly the noticed violations of the regulations, and did not "exercise their responsibilities and power to use all objectively possible means to discover, prevent, and remedy any and all violations." The court concluded that "[i]mposing penalties against persons at the highest levels of a corporation is the best way to ensure the adoption of corporate policies and practices which will avoid violations of strict liability public welfare and regulatory offenses."

Finally, the statement of decision reflects the penalties were proportional and not excessive. When selecting the amount of penalties, the court found the Roscoes "were evasive and not credible" "regarding [their] assets." It imposed the statutory minimum of $500 per day for all the causes of action except for the cause of action related to failing to take remedial action, for which the court imposed a penalty of $1,000 per day, which still was one-fifth of the statutory maximum of $5,000 per day. As to that cause of action, the court noted had timely cleanup occurred, the cost would have been approximately $400,000 instead of the $1.5 million already expended to date and that "the officers" of The Customer Company "did not take seriously the multiple notices of violations," "they did nothing other than refer one or two of the notices to Parker," and made no attempt "to make sure the problems were addressed."

On this record, the statement of decision is sufficient to defeat the Roscoes' arguments regarding the penalties.

## DISPOSITION

The judgment is affirmed. The People shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

Hull, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied January 15, 2009, and appellants' petition for review by the Supreme Court was denied April 15, 2009, S170300. Chin, J., did not participate therein.